842 F.Supp. 733 (1994)
In re McDONNELL DOUGLAS EQUIPMENT LEASING SECURITIES LITIGATION.
Frank CARPI, as custodian for Stephen Carpi, Plaintiff,
v.
McDONNELL DOUGLAS CAPITAL INCOME FUND-I, McDonnell Douglas Capital Income IA, L.P., McDonnell Douglas Capital Income IB, L.P., McDonnell Douglas Capital Income IC, L.P., McDonnell Douglas Capital Income ID, L.P., McDonnell Douglas Capital Income IE, L.P., McDonnell Douglas Capital Services, Inc., McDonnell Douglas Capital Corporation, McDonnell Douglas Finance Corporation, McDonnell Douglas Capital Leasing Corporation, McDonnell Douglas Corporation, Alan M. Forrester, Thomas F. Husband, John R. Chasteen, James T. McMillan, Thomas J. Lawlor, Jr., George M. Rosen, Donald V. Black, Daniel O. Anderson, and Gruntal & Co., Inc., Defendants.
Michael R. EDELMAN, Plaintiff,
v.
TROY LEASE INCOME FUND, Troy Capital Services, Inc., McDonnell Douglas Capital Corporation, McDonnell Douglas Finance Corporation, McDonnell Douglas Capital Leasing Corporation, MDCC Securities Corporation, McDonnell Douglas Corporation, Alan M. Forrester, John R. Chasteen, James T. McMillan, Thomas J. Lawlor, Jr., George M. Rosen, Donald V. Black, and Daniel O. Anderson, Defendants.
Richard WALDMAN, on his own behalf and on behalf of all others similarly situated, Plaintiff,
v.
TROY CAPITAL SERVICES, INC., McDonnell Douglas Capital Corporation, McDonnell Douglas Finance Corporation, McDonnell Douglas Corporation, and MDCC Securities Corporation, Defendants.
No. MDL No. 873. Nos. 90 Civ. 3448 (JMC), 90 Civ. 6968 (JMC), 90-72905-DT.
United States District Court, S.D. New York.
January 21, 1994.
*734 *735 *736 Robert M. Kornreich (Lead Counsel), Wolf Popper Ross Wolf & Jones, Jonathan M. Plasse, Goodkind, Labaton & Rudoff, New York City, Lewis S. Sandler, Beigel & Sandler, Chicago, IL, for plaintiffs.
E. Michael Bradley, I. Scott Beiler, Brown & Wood, New York City, James A. Smith, Bodman, Longley & Dahling, Detroit, MI, David M. Brodsky, Schulte Roth & Zabel, New York City, for defendants.

MEMORANDUM AND ORDER
CANNELLA, District Judge:
Before this Court is a joint petition for an award of attorney's fees and litigation expenses to be paid out of a $14,750,000 settlement fund that was established through this Court's Memorandum and Order 838 F.Supp. 729 dated October 26, 1993 (the "Settlement Order"). This Settlement Order approved a proposed settlement of a consolidated-multidistrict action, consisting of three separate class actions, in which the plaintiffs had alleged that the defendants violated the federal securities laws, and the common law, in connection with their public offerings of units in certain limited partnerships. The Settlement Order further held counsel's joint fee petition in abeyance pending the submission of contemporaneous time records and expense reports, accompanied by additional affidavits, so as to allow this Court to compute a fair and equitable fee award under the lodestar method of fee computation.
Plaintiffs' lead counsel has since submitted the requested information and has re-explicated its joint petition for a fee award in the amount of $4,000,000, and for the reimbursement of litigation expenses in the amount of $68,604.42. The requested $4,000,000 fee award thus represents approximately 27.12% of the $14,750,000 settlement fund, and approximately 24.71% of the $16,187,019.56 aggregate economic benefits to be received by the plaintiffs as a result of the settlement.
The Court has thoroughly reviewed this petition and the applicable precedents and policies affecting the fee computation. For the reasons discussed herein, the Court has employed the lodestar method of fee computation, as adjusted by a uniform risk-enhancement factor of 1.44. Applying this approach to its review of the documentation and the affidavits that have been submitted, the Court hereby awards plaintiffs' joint counsel attorney's fees of $2,454,791.40 and litigation expenses of $55,427.80.
Familiarity of the reader with this Court's Settlement Order is assumed. Nonetheless, for purposes of consolidation, a discussion of the nature of the instant action and the resulting settlement is provided below.

BACKGROUND
This fee petition comes before this Court in connection with the settlement of the instant consolidated-multidistrict action. This consolidated-multidistrict action consists of the following three actions: (1) a class action entitled Carpi v. McDonnell Douglas Capital Income Fund-I, 90 Civ. 3448 (JMC) (the "Carpi action"); (2) a class action entitled *737 Edelman v. Troy Lease Income Fund, 90 Civ. 6968 (JMC) (the "Edelman action"); and (3) a purported class action entitled Waldman v. Troy Capital Services, Inc., No. 90-72905-DT (the "Waldman action").
Each of the instant settled actions arose out of the initial public offerings of units of limited partnership interests in two related equipment-leasing limited partnerships  the McDonnell Douglas Capital Income Fund ("MDCIF-I") and the Troy Lease Income Fund ("TLIF"). These limited partnerships together sold a total of approximately $85 million worth of units to investors. The plaintiffs alleged that the prospectuses and offering materials disseminated in connection with the public offerings of units in these limited partnerships portrayed these investments as conservative, and further indicated that investors would likely receive specified monthly distributions, and the return of their capital, at the end of the stated seven-year investment period. The plaintiffs also alleged that, notwithstanding such statements within the offering materials, within the first two years of the limited partnerships' operations, the partnerships announced that investors would not be receiving any return on their investment, that investors were unlikely to recover their capital investments therein, and that substantial writedowns of assets would be made in the books and records of the defendant partnerships. The plaintiffs further alleged that the high-risk nature of these investments was known to the defendants, and that the limited partnerships, contrary to the representations contained in the offering materials, acquired obsolete and outdated computer and computer-related equipment for leasing at prices far above market value.
The instant settled actions were brought on behalf of unitholders in the aforementioned limited partnerships under the federal securities laws, and the common law, alleging that the offering materials contained certain misrepresentations and omissions. The plaintiffs alleged violations of Sections 11, 12(2) and 15 of the Securities Act of 1933, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, and the common law. (The Waldman action also asserted a violation of the federal racketeering statute.)
By Memorandum and Order dated October 26, 1993, following a hearing on notice at which no objections were stated, this Court approved the settlement of each of the instant actions as fair, reasonable, and beneficial to the settling classes.
The Court noted within this Settlement Order that only two unitholders, owning 145 units in the aggregate, requested exclusion from the MDCIF-I Class, and that no persons opted out of the TLIF Class. Further, the Court now notes that as of the date of the instant Memorandum and Order, it has received seven letters, each dated subsequent to the date of the settlement hearing, expressing opposition to plaintiffs' counsel's joint application for attorney's fees.
The settlement of the instant actions has two components: (1) the creation of a $14,750,000 settlement fund; and (2) the liquidation of the defendant limited partnerships. The $14,750,000 settlement fund is comprised of (a) a payment of $13,375,000 by or on behalf of all defendants other than Gruntal (the "McDonnell Douglas defendants") to settle the claims in all of the consolidated actions, and (b) a payment of $1,375,000 by Gruntal to settle the claims in the Carpi action alone.[1] The $13,375,000 payment by or on behalf of the McDonnell Douglas defendants is to be allocated among all the partnerships in accordance with a formula designed to equalize the overall recoveries (other than the Gruntal recovery) to investors who purchased their interests in the initial offerings of units and who held their units through the time of the liquidating distribution to each partnership. The $1,375,000 to be paid by Gruntal will be allocated pro rata solely among each of the MDCI Partnerships based on the number of units sold by the MDCI Partnerships.
The second component of the settlement is the liquidation of the limited partnerships. According to the Stipulation of Settlement, the liquidation of the limited partnerships was to be accomplished by: (a) the proposed *738 sale of each partnership's equipment, subject to any related leases and any related indebtedness, to MDCC or its designee or designees; (b) the waiver of the terms of the Amended and Restated Agreement of Limited Partnership of each partnership to the extent necessary to permit the sale; and (c) the dissolution and liquidation of the limited partnerships following the aforementioned sale, including the distribution to the limited partners of the proceeds of the sale of the partnerships' equipment portfolios, and all cash and cash equivalents of the partnerships. As a condition of the settlement, this integrated proposal had to be approved by a majority of the limited partners of each of the partnerships pursuant to the partnerships' respective partnership agreements. Accordingly, the general partner solicited the consents of the limited partners to the proposal, and provided a 149-page information statement to each limited partner in connection therewith. The proposal was ultimately approved by a majority of the limited partners of each of the defendant partnerships.
By Order dated December 17, 1993, on consent of all parties, this Court approved a plan for the liquidation and dissolution of the defendant limited partnerships (the "Distribution Order"). The Distribution Order provided for one change from the Stipulation of Settlement. Under the settlement, MDCC agreed, among other things, to purchase the partnerships' equipment portfolios for 110% of their portfolio value as of the effective date of the settlement (the "Purchase Price"), to retain 10% of that Purchase Price as a "Holdback" pending the resale of the equipment portfolios to an unaffiliated third-party, and, upon such resale, to keep a portion of the Holdback or to make an additional distribution of the proceeds of such sale in accordance with the formula set forth in the Stipulation of Settlement. Thus, the Stipulation of Settlement contemplated two distribution orders relating to the liquidation and distribution of the partnerships: the first, relating to the purchase by MDCC of the equipment portfolios at the Purchase Price; and the second, relating to the sale by MDCC of the equipment portfolios to an unaffiliated third party.
On December 8, 1993, MDCC, pursuant to the Stipulation of Settlement, sold the equipment portfolios to Data Sales, an unaffiliated third party, at prices which, after application of the formula set forth in the Stipulation of Settlement, would yield limited partners of the partnerships the maximum amount that they could obtain under the settlement, i.e., 121% of the portfolio value. To expedite the process of making the liquidating distributions, the parties thereafter agreed to a modification of the distribution procedure whereby MDCC purchased the equipment portfolios directly from the partnerships at 121% of their portfolio value.
Pursuant to this modification, which was reflected in this Court's Distribution Order on Consent that was entered on December 17, 1993, the distribution contemplated by this Distribution Order was made on December 23, 1993 to limited partners of the partnerships comprising McDonnell Douglas Capital Income Fund-I and Troy Lease Income Fund. In addition, as also contemplated by the Distribution Order, Certificates of Cancellation of Certificates of Limited Partnership for such partnerships were filed with the Secretary of State of the State of Delaware on December 28, 1993.
One additional element of the settlement warrants discussion. Pursuant to the Stipulation of Settlement, the McDonnell Douglas defendants agreed to pay a number of costs that otherwise would have been chargeable to the settlement fund. Included among these costs were: (a) all costs of mailing the notice of proposed settlement to members of the classes and the cost of publishing a summary notice in the national editions of The Wall Street Journal and The New York Times; (b) all costs of distribution of the net fund; (c) the fee and expenses of selecting and retaining an independent financial consulting firm to render financial advice and assistance to the plaintiffs, and to provide them with an opinion as to the fairness, from a financial point of view, of the purchase price to be paid to the partnerships for the equipment portfolios in the sale; and (d) all costs associated with the consent solicitation, including the costs of preparing, printing and *739 mailing the accompanying information statement.
The Court finds that, in light of the recent sale and liquidation of the equipment portfolios of the partnerships at 121% of their portfolio values, the aggregate economic benefits of the settlement to the class members total approximately $16,187,019.56. The Court has computed this amount by adding together the following components of the settlement:
(1) The amount of $14,750,000, to be paid by the McDonnell Douglas defendants and Gruntal, constituting the settlement fund;
(2) The amount of $160,000 paid by the McDonnell Douglas defendants for the retention by plaintiffs' counsel of the firm of Duff & Phelps to render financial advice on behalf of the class members;
(3) The amount of approximately $180,000 for the administrative and notice-related costs paid by the McDonnell Douglas defendants, including the printing and mailing of the 149-page information statement;
(4) The amount of $616,131, representing the benefit to the class members of receiving their pro-rata share of the partnerships' cash and non-cash assets pursuant to the settlement now, instead of in 1995 (the end of the stated investment period for the partnerships), assuming that the class members immediately reinvested their respective liquidating distributions in 2-year treasury bills. See Affidavit of Robert M. Kornreich in Support of Proposed Settlement and in Support of Plaintiffs' Counsel's Request for an Award of Attorneys' Fees and Reimbursement of Expenses, at Exh. 2 [hereinafter "First Kornreich Aff."].
(5) The amount of $480,888.56, representing the increased consideration received by the classes as a result of plaintiffs' counsel's settlement negotiations concerning the sales price of the limited partnerships' equipment portfolios. This amount is the difference between (a) $1,264,946, representing the amount of the liquidation proceeds resulting from the sale of the limited partnerships' equipment portfolios pursuant to the settlement, valued at 121% of their net book value as of December 1, 1993 (the effective date of the settlement, see Distribution Order, at 6), and (b) $784,057.44, representing 75% of such net book value, which was the amount of liquidation proceeds that the McDonnell Douglas defendants offered to pay in a proposed sale of the equipment portfolios in an unnegotiated liquidation of the partnership (($1,264,946 / 1.21) * 75% = $784,057.44). See First Kornreich Aff., supra, ¶ 37(e), at 28.
Without considering reductionary adjustments attributable to the time value of money, and augmenting adjustments attributable to the recent sale and liquidation of the equipment portfolios of the partnerships at 121% of their net asset value, plaintiffs' lead counsel, in his affidavit supporting this proposed settlement, has attested that by adding together (1) the amount of monthly distributions previously received by the limited partners, (2) the amount of the liquidating distribution that the class members are expected to receive pursuant to the settlement, and (3) the amount of the fund created through the settlement  members of the MDCIF-I Class will have recovered 97.44% of their initial investment in MDCIF-I, and members of the TLIF Class will have recovered 95.62%[2] of their capital investment in TLIF after subtracting counsel's requested joint fee award of $4,000,000. See id. ¶ 39, at 29.
The particulars of the settlement having been set forth above, the Court now turns to describe the analytical framework with which is will review the instant fee petition.

DISCUSSION

I. Standards and Analysis Governing the Court's Fee Determination

The common-fund doctrine is an exception to the American Rule against court-awarded attorney's fees. Under this doctrine, the court, in exercise of its general equitable powers, apportions the attorney's fees attributable to the creation or the preservation of a common fund by charging the *740 fees against such fund. See 1 Mary F. Derfner & Arthur D. Wolf, Court Awarded Attorney Fees 2-1 (Rel. 17, 1993). This equitable assessment and apportionment of fees upon a fund is designed to prevent the unjust enrichment of persons, including members of a plaintiff class, who would otherwise reap the benefits of the litigation without bearing its costs. See Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (lawyer who recovers common fund for benefit of persons other than himself is entitled to reasonable attorney's fee from fund).
Where an equitable fund is created through the settlement of a class-action suit, the court, as guardian of the rights of the class members, is not bound by the amount of the fee award that counsel has requested. This is so even though notice of the fee request has been provided to all class members to accord them a sufficient opportunity to object. See Piambino v. Bailey, 610 F.2d 1306, 1328 (5th Cir.) (district court not bound by agreement of parties as to amount of attorney's fees in settlement of class action), cert. denied, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); 1 Derfner & Wolf, supra, ¶ 6.02, at 6-12.3. Rather, the court, in its fiduciary role, must recognize that regardless of how well intentioned plaintiffs' counsel may be, the attorney and the client stand as adverse claimants with respect to the same settlement fund. Accordingly, a comprehensive review of the fee petition is warranted.
Under the law of the Second Circuit, the lodestar method is the proper approach for computing the assessment of attorney's fees against an equitable fund. Historically, fees in common-fund cases had been computed as a percentage of the fund. See Breiterman v. Roper Corp. [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, at 94,832, 1990 WL 15535 (S.D.N.Y. Jan. 12, 1990) (citing Mashburn v. National Healthcare, Inc., 684 F.Supp. 679, 688 (M.D.Ala.1988)). The application of the percentage method, however, lent itself to arbitrary  and often quite exorbitant  fee awards that sometimes failed to reflect accurately the time and the energy spent by plaintiff's counsel, the quality of the representation, and the stage in the litigation process at which a settlement was achieved. In addition, the public perception that `windfall fees' were being awarded left many critics to lament that "`the only persons to gain from a class suit are not the potential plaintiffs, but the attorneys who will represent them.'" City of Detroit v. Grinnell Corp., 495 F.2d 448, 469 (2d Cir.1974) (quoting Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 571 (2d Cir.1968) (Lumbard, J., dissenting)). In response to these concerns, a major jurisprudential shift was inaugurated in Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 166-67 (3d Cir.1973), in which the Court of Appeals for the Third Circuit adopted what is commonly described as the "lodestar" analysis. The lodestar approach was thereafter employed in a common-fund case by the Second Circuit Court of Appeals in City of Detroit v. Grinnell Corp., 495 F.2d 448, 470-71 (2d Cir.1974), and in 1992 was reiterated as the law of the Second Circuit in Grant v. Martinez, 973 F.2d 96, 99 (2d Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993).[3]
Under the lodestar approach, the court computes a `lodestar' by multiplying the number of hours reasonably expended in litigation by a reasonable hourly rate. See id. These variables are ascertained through the court's review of contemporaneous time records and expense reports submitted by counsel that provide brief descriptions of the purpose of the work performed and the expenses incurred. See Gucci Am., Inc. v. Rebecca Gold Enters., 89 Civ. 4736 (BN), 1993 WL 88270, at *3 n. 2, 1993 U.S.Dist.LEXIS 3486, at *8 n. 2 (S.D.N.Y. Mar. 23, 1993) (citing Lewis v. Coughlin, 801 F.2d 570, 577 (2d Cir.1986)). The Second Circuit has granted the district courts considerable latitude in protracted litigation, such as the instant actions, to apply counsel's current hourly rates in computing the lodestar *741 so as to compensate counsel for the time value of money (i.e., the interest cost) attributable to the delay between the time that legal services are rendered and such time that payment is ultimately received from the common fund. See Grant, 973 F.2d at 100 (citation omitted). The court may then adjust the lodestar up or down by the application of a multiplier based upon certain factors, the most prominent of which is an adjustment for the risk of loss associated with the undertaking of representation on a contingent basis. This enhancement for risk of loss  that is, the risk that no equitable fund will be created out of which attorney's fees may be paid, either through a victory on the merits, or through a court-approved settlement  is necessary to equate an attorney's hourly billing rates (which are premised upon the assumption that the attorney will be fully compensated for the services she performs) to a risk-adjusted rate that considers the substantial possibility that the plaintiff will neither prevail on the merits nor reach a settlement. Needless to say, in a contingent-fee arrangement, if a judgment were entered against the class-action plaintiffs, no fund would be created out of which the attorney could be compensated. See Grinnell Corp., 495 F.2d at 471 (stating that the contingent risk of litigation was perhaps the "foremost" factor in determining the proper enhancement to counsel's lodestar because "despite the most vigorous and competent of efforts, success is never guaranteed.").
The use of a risk-enhancement adjustment is appropriate where attorney's fees are to be paid from an equitable fund created through litigation. While the Supreme Court has expressly prohibited post-lodestar risk-enhancement adjustments in fee petitions brought pursuant to fee-shifting statutes, see City of Burlington v. Dague, ___ U.S. ___, ___-___, 112 S.Ct. 2638, 2643-44, 120 L.Ed.2d 449 (1992), neither the Supreme Court nor the Second Circuit has extended this interdiction to common-fund cases. In addition, in Grant v. Martinez, 973 F.2d 96 (2d Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993), the Second Circuit Court of Appeals, in commenting upon Burlington, expressly stated that "[a]lthough there is a `strong presumption that the lodestar figure represents the reasonable fee,' other considerations may lead to an upward or downward departure from the lodestar." Id. at 101 (quoting Burlington, ___ U.S. at ___, 112 S.Ct. at 2641) (additional citation omitted). Indeed, many of the policies that have motivated Congress to enact fee-shifting statutes  including the encouragement of litigation to achieve social goals in consonance with civil-rights legislation  are simply not applicable to a district court's computation of a reasonable attorney's fee to be assessed against an equitable fund.
Finally, the Court does not ignore the conceptual distinctions between fee-shifting statutes and the common-fund doctrine. Fee-shifting statutes, as the name implies, are designed to shift liability for the plaintiff's attorney's fees from the prevailing plaintiff to the defendant. In contrast, the common-fund doctrine is a judicial precept that is designed to prevent the unjust enrichment of the beneficiaries of another person's litigation. Therefore, the Court concludes that Burlington's admonition against a post-lodestar adjustment for risk should not apply to an award of attorney's fees that is payable from a settlement fund. The Court does recognize, however, that all other factors bearing on the ultimate fee award, including the quality of representation, the complexity of the litigation, the delay in the receipt of payment, and the skillfulness of opposing counsel, are properly includable in the computation of the lodestar amount.
The risk-enhancement factor lends itself to mathematical equation. As the Supreme Court acknowledged in Burlington, ___ U.S. at ___, 112 S.Ct. at 2642, in a contingent-fee arrangement, "the attorney bears a contingent risk of nonpayment that is the inverse of the case's prospects of success: if his client has an 80% chance of winning, the attorney's contingent risk is 20%." Id. The risk-enhancement factor may thus be computed by dividing 1 by the difference between 1 and that decimal which represents the contingent risk. For example, returning to the Supreme Court's illustration in Burlington, if a court determined that there was *742 a 20% (0.2) risk that the plaintiffs would lose their lawsuit outright  that is to say, that plaintiffs would neither prevail on the merits nor settle  the risk-enhancement factor would be 1.25, computed as follows:

 1.0 1.0
 = = 1.25
 _________ ___
 1.0 - 0.2 0.8

The Court further recognizes that the degree of risk attending plaintiffs' counsel's representation in a class-action suit will vary throughout the course of litigation. Thus, in its Settlement Order, this Court requested affidavits from plaintiffs' counsel in each of the instant consolidated actions concerning counsel's perceived risk of loss as of the commencement date of litigation, and at each six-month anniversary thereof. The Court further directed counsel to summarize their time-record data over six-month intervals. By so doing, the Court would have the ability  if circumstances warranted it  to apply a separately computed risk-enhancement factor to `sub-lodestars' computed for each six-month period during litigation.
In addition to obtaining evidence by affidavit as to these subjective assessments of risk, the Court has established an objective-benchmark level of risk based upon its review of class-action security suits that have been litigated over the past ten years. The Court has reviewed the disposition of a number of class-action security suits brought within the Second Circuit, or for which certiorari was granted by the United States Supreme Court, during the ten-year period concluding on October 26, 1993  the date of the Settlement Order. By using electronic databases, the Court has uncovered a sample of 143 court documents issued by either the Supreme Court, the Second Circuit Court of Appeals, or the district courts within the Second Circuit during the period between October 27, 1983 and October 26, 1993. Each of these documents address various motions or appeals in class-action suits brought under either sections 11, 12(2) or 15 of the Securities Act of 1933, sections 10(b) or 20(a) of the Securities Exchange Act of 1934, or Rule 10b-5 promulgated thereunder.[4] The Court has traced the subsequent disposition of the cases within this sample by using automated cite-checking services, and by conducting both an automated and a manual search of the Clerk's Records of the United States District Court for the Southern District of New York. Through these procedures, the Court has identified 34 separate actions that have been settled,[5] 15 separate actions in which the plaintiffs have lost outright through the dismissal of their complaint, and no action in which the class-action plaintiffs have prevailed on the merits. This therefore establishes a benchmark risk of loss of 30.61%, which computes to a benchmark risk-enhancement factor of 1.44.
The Court regards this benchmark risk-enhancement factor to be the more accurate indicator of the actual risk of loss faced by plaintiffs' counsel. The benchmark will thus serve as a uniform risk-enhancement factor to be applied throughout the course of litigation, and to be departed from only where plaintiffs' counsel has attested that for any six-month interval during litigation, he or she perceived the risk of loss to be less than the benchmark risk of loss. In such event, the subjective risk of loss will be used for the specified interval. Thus, the objective benchmark will serve as the primary risk-enhancement factor to be applied uniformly throughout the course of litigation, which only may be decreased  and never increased  where plaintiffs' counsel has attested to a lesser perceived risk of loss.
Having set forth the policies and the principles that will guide this Court's fee analysis, the Court now turns to the actual mechanics of the fee computation.

*743 II. Computation of the Fee Award[6]

A. Computation of the Lodestar Amount
As directed by this Court, plaintiffs' counsel in each of the settled actions has submitted computer-generated time-accounting schedules with respect to such actions. These schedules identify the date that work was performed, the nature of the work, the attorney or the paralegal who performed such work, and the billing rate assigned to the attorney or the paralegal. Counsel in each of the actions has attested that these schedules were compiled from daily time records that were contemporaneously prepared and kept by each attorney and paralegal.
As per this Court's instructions, the time-accounting information has been summarized by counsel on an aggregate basis for the entire action, and for each six-month interval during litigation. This information has been summarized further from the inception of litigation through October 20, 1992, and from October 21, 1992 through September 7, 1993.[7]
Counsels' time-accounting information is summarized below.

Schedule A: Inception of litigation through October 20, 1992
Firm Hours Requested Lodestar
Wolf Popper Ross Wolf & Jones 3,442.70 $1,095,180.00
Goodkind Labaton Rudoff & Sucharow 888.70 $ 223,849.00
Beigel & Sandler 481.50 $ 80,630.00
 _________ ______________
 TOTALS 4,812.90 $1,399,659.00
 ========= ==============
Schedule B: October 21, 1992 through September 7, 1993
Firm Hours Requested Lodestar
Wolf Popper Ross Wolf & Jones 798.90 $ 269,799.00
Goodkind Labaton Rudoff & Sucharow 117.20 $ 32,152.00
Beigel & Sandler 9.50 $ 3,106.25
 _________ ______________
 TOTALS 925.60 $ 305,057.25
 ========= ==============
Schedule C: Inception of litigation through September 7, 1993
Firm Hours Requested Lodestar
Wolf Popper Ross Wolf & Jones 4,241.60 $1,364,979.00
Goodkind Labaton Rudoff & Sucharow 1,005.90 $ 256,001.00
Beigel & Sandler 491.00 $ 83,736.25
 _________ ______________
 GRAND TOTALS 5,738.50 $1,704,716.25
 ========= ==============

Affidavit of Robert M. Kornreich in Further Support of Plaintiffs' Counsel's Request for an Award of Attorneys' Fees and Reimbursement of Expenses, at Exh. 5 [hereinafter "Second Kornreich Aff."].
For the entirety of litigation, the average hourly billing rates, and the range of current billing rates, of each of the above-named firms for the instant actions were as follows:

*744
 Average Hourly Range of Hourly
Firm Billing Rates Billing Rates
Wolf Popper Ross Wolf & Jones $ 321.81 $ 110 - $ 425
Goodkind Labaton Rudoff & Sucharow $ 254.50 $ 85 - $ 395
Beigel & Sandler $ 170.54 $ 30 - $ 400

The Court has duly noted the complexity of this multidistrict action and the substantial experience of plaintiffs' counsel in class-action securities litigation. In addition, the Court has reviewed the daily time-accounting data that has been submitted, and has not come across any evidence that suggests a padding of hours, or a marked failure of counsel to delegate appropriate work to staff with lower billing rates. Further, the Court does not regard the asserted hourly billing rates to be excessive in view of today's legal marketplace. Accordingly, the Court reaches a tentative determination that both the number of billable hours claimed and the current billing rates asserted are reasonable. Therefore, the figure of $1,704,716.25, see supra sch. C, will constitute the tentative lodestar amount.
This tentative determination, however, is only the beginning of the Court's ascertainment of the proper lodestar amount. "[U]nder appropriate circumstances, the Court may make ... [a] downward departure from the lodestar amount." Rivera v. Dyett, 88 Civ. 4707 (PKL), 1993 WL 36159, at *6, 1993 U.S.Dist.LEXIS 1361, at *19 (S.D.N.Y. Feb. 10, 1993) (citing Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). Appropriate circumstances would exist if the benefits to the class members had been materially diminished through counsel's ineffective representation. Such ineffective representation would be manifested, for example, if the class members were prejudiced economically  either in nominal terms or through the erosion of their recovery through the time value of money  due in part to counsel's lack of skill or diligence in conducting any part of the litigation. This would include any dilatory conduct by counsel, or the submission of incomplete or unsatisfactory billing or expense data with respect to the fee application so as to delay the ultimate distribution of the settlement fund.
This is not the case here. Plaintiffs' lead counsel has at all times demonstrated to this Court the highest caliber of representation, measurable both in quantitative terms (i.e., the benefits of the settlement to the class members), and in the professionalism, the timeliness, and the thoroughness of lead counsel's written submissions. As the Court noted in its Settlement Order, the settlement was reached after more than two years of arm's-length negotiations by competent counsel with extensive experience in securities litigation, and after sufficient discovery had been undertaken by such counsel to allow for a thorough evaluation of the case. See Settlement Order, at 18, 21. In addition, the total benefits of the settlement to the class members constituted approximately 54% of the maximum amount recoverable under lead counsel's preliminary determinations. See id. at 22. Further, plaintiffs' lead counsel has attested in his affidavit that as a result of the settlement  after deducting the requested fee award  investors in each of the plaintiff classes will have recovered in excess of 95% of their initial capital investments without considering reductions attributable to the time value of money. See First Kornreich Aff., supra, ¶ 39, at 29. The Court has reviewed the financial data accompanying counsel's submissions in connection with the Settlement Order, and has not come across any information that contradicts this assertion.
Certain other factors lead this Court to conclude that the tentative lodestar amount is reasonable. Plaintiffs' counsels' settlement negotiations and their conduct of discovery has not occurred in a vacuum, but rather has proceeded in face of vigorous opposition by defendants' counsel. With respect to this matter, as the Court earlier noted, the amount of the proceeds that the class members ultimately received through the liquidation of the partnerships' equipment portfolios substantially exceeded the amount that defendants' counsel initially offered. *745 Lastly, the Court notes that pursuant to the Stipulation of Settlement, the McDonnell Douglas defendants agreed to pay all of the costs attributable to the administration and the distribution of the settlement fund, thereby preserving the fund for the class members. See Settlement Order, at 10.
In sum, plaintiffs' counsel has satisfied the Court that both the number of billable hours claimed and the current billing rates asserted are reasonable. Accordingly, the Court concludes that an award of the full lodestar amount of $1,704,716.25 is appropriate under the circumstances.

B. Application of the Risk-Enhancement Factor
As the Court earlier stated, the computation of a fee award in a common-fund case does not end upon the determination of the appropriate lodestar amount. Rather, a risk-enhancement factor must thereafter be applied to compensate plaintiffs' counsel for the risk of loss associated with undertaking representation on a contingent-fee basis.
As this Memorandum and Order earlier discussed, by tracking a sample of federal securities law actions litigated within the Second Circuit, or for which certiorari was granted by the United States Supreme Court, this Court has established a benchmark risk of loss of 30.61%, which computes to a risk-enhancement factor of 1.44. Further, the Court noted that this benchmark risk-enhancement factor would be applied uniformly throughout litigation, unless plaintiffs' counsel were to attest by affidavit that for any six-month interval during litigation it perceived a lesser risk of loss.
In his second affidavit in support of the joint-fee petition, plaintiffs' lead counsel, on behalf of plaintiffs' counsel in each of the instant actions, has asserted that he perceived different risks of loss for two separate intervals during litigation. These asserted risks of loss and the corresponding risk-enhancement factors are noted below.

 Asserted Asserted Corresponding
 Range of Average Risk-Enhancement
Interval Risk of Loss Risk of Loss Factor
Inception of Litigation
through 10/20/92 60% to 65% 62.5% 2.67
10/21/92 through 9/7/93 30% to 40% 35% 1.54

See Second Kornreich Aff., supra, ¶ 19-20, at 12-13.
As one will observe, plaintiffs' lead counsel contends that October 20, 1992 constituted a critical date in the progression towards a settlement of the instant actions. He asserts that it was not until this date that (i) all material terms of a proposed settlement had been reached, (ii) a financial consulting firm had rendered an opinion as to the fairness of the provisions of the proposal relating to the sale of the partnerships' equipment portfolios, and (iii) the partnerships' information statement had been filed for review with the Securities and Exchange Commission [SEC]. See id. ¶ 19, at 12. He further contends that although the likelihood of settlement increased greatly after that date, a substantial risk of loss nevertheless existed for the remainder of litigation. He asserts that these continuing risks were attributable to (i) the negotiation of additional terms of the Stipulation of Settlement, (ii) the necessity of obtaining SEC clearance for the unitholder consent solicitation and the information statement, (iii) the possibility that the requisite percentage of unitholder consents needed for the liquidation and the dissolution of each of the six limited partnerships would not be obtained, and (iv) the possibility that the Court would not approve the settlement. See id. ¶ 20, at 13.
Comparing counsel's asserted risk-enhancement factors of 2.67 and 1.54 to the benchmark factor of 1.44, the Court observes that the benchmark is the lowest of the three. Thus, in accordance with the standards earlier discussed, the Court will apply *746 the benchmark uniformly throughout the course of litigation.
Multiplying the lodestar amount of $1,704,716.25 by the benchmark risk-enhancement factor of 1.44, the Court arrives at a product of $2,454,791.40. This amount constitutes approximately 16.64% of the $14,750,000 settlement fund, and approximately 16.71% of the settlement fund net of deductions attributable to approved reimbursable expenses. See infra. The Court regards this amount to constitute a fair and equitable fee award. Accordingly, the Court awards this amount of $2,454,791.40 to plaintiffs' joint counsel.

III. Request for Reimbursement of Litigation Expenses

Plaintiffs' joint counsel also seeks reimbursement of litigation expenses in the amount of $68,604.42. As this Court has directed, plaintiffs' counsel in each of the instant actions has submitted computer-generated records of expenses, which have been separately stated on a daily basis. Counsel in each of the actions has further attested that the underlying records were maintained in the ordinary course of business, and are supported by contemporaneous documentation including vouchers, invoices, and receipts.
The Court regards the principles underlying the common-fund doctrine to apply with equal force to the reimbursement of expenses from a settlement fund. In short, all expenses that are directly attributable to the creation or the preservation of the fund may be charged against such fund for equitable apportionment among its beneficiaries.
A more difficult question arises with respect to overhead costs. Plaintiffs' joint counsel seeks reimbursement of word-processing charges and other similar costs, including non-professional-staff overtime costs. Upon careful consideration, the Court does not regard these expenses to be sufficiently related to the creation of the fund to justify their imposition thereon. Accordingly, reimbursement of these expenses is denied.
In addition, under these same restitutory principles, the Court denies any reimbursement of expenses incurred by plaintiffs' counsel after September 7, 1993. The Court assumes that these expenses pertained predominantly to the preparation of the fee petition. These expenses, therefore, did not benefit the fund as a whole; rather, they accrued primarily to the benefit of plaintiffs' counsel. Thus, these expenses may not be charged against the settlement fund.
On a similar basis, no reimbursement will be allowed for meals expenses.
The Court, however, regards the remainder of joint counsel's asserted litigation expenses to be sufficiently related to the creation of the fund to warrant their charge thereto. These costs include court-filing fees, court-reporter fees, postage costs, copying costs, computerized research costs, and travel expenses incurred in connection with the taking of depositions. Accordingly, the Court has determined that the amount of $55,427.80, as summarized below by firm, should be charged against the settlement fund to reimburse plaintiffs' joint counsel.

Wolf Popper Ross Wolf & Jones $ 43,621.60
Goodkind Labaton Rudoff & Sucharow $ 8,525.06
Beigel & Sandler $ 3,281.14
 ___________
 TOTAL $ 55,427.80
 ===========

CONCLUSION
Plaintiffs' counsel is awarded attorney's fees in the amount of $2,454,791.40 and litigation expenses in the amount of $55,427.80 payable from the settlement fund established *747 by this Court's Memorandum and Order dated October 26, 1993.
SO ORDERED.
NOTES
[1] Gruntal is a defendant only in the Carpi action.
[2] According to plaintiffs' lead counsel, the difference in the percentages of recovery for members of the MDCIF-I and the Troy classes reflects the fact that Gruntal's contribution is to the MDCIF-I Class alone.
[3] Although Grant involved a petition for a fee award under a fee-shifting statute, the policy choices reflected in Grant's endorsement of the lodestar approach apply with equal force to the common-fund context. The Court regards these policies to favor a comprehensive  yet workable  disposition of the fee petition that is fair to all parties involved.
[4] The search criteria on LEXIS that the Court used are as follows:

Library: Mega
File: 2Mega
Search Request: (((11 or 12(2) or 15) w/25 "Securities Act") or ((10(B) or 20(A)) w/25 "Securities Exchange Act") or "Rule 10b-5") w/50 class! w/10 (action! or suit!) and date aft 10/26/83 and date bef 10/27/93
[5] This includes one action in which the court confirmed an arbitration award.
[6] The Court's review of plaintiffs' counsel's joint request for reimbursement of litigation expenses is discussed infra in Part III.
[7] As will be discussed, this delineation corresponds to lead counsel's attestation that the likelihood of settlement increased after October 20, 1992.